Opinion issued June 26, 2025



In The

# Court of Appeals

For The

## First District of Texas

———————————————

### NO. 01-22-00918-CV

———————————————

**THOMAS CRAIG CONSTRUCTION, INC., Appellant**

**V.**

**PARK SQUARE CONDOMINIUM OWNER'S ASSOCIATION, FOURPOINTS SERVICES, INC., CHRIS TUCKER CONTRACTING, VINCE KNIGHT D/B/A KNIGHT RESTORATION, AND VIKING CONTRACTORS, INC., Appellees**

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-82805**

---

### MEMORANDUM OPINION

This interlocutory appeal involves some construction work on a condominium complex, an arbitration clause, and approximately three years of multi-party litigation before anybody mentioned moving the case from court to arbitration.

The appeal does not raise the question whether the parties agreed to arbitrate. They plainly did. The general contract calls for arbitration "by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement." Instead, the parties dispute whether Thomas Craig Construction, Inc. waived the right to arbitrate as a result of what took place during the three years of litigation.

The right to arbitrate can be waived by conduct—but not easily. Someone who seeks to establish such waiver has the heavy burden of showing that the other party substantially invoked the judicial process in a manner inconsistent with the right to arbitrate. *See, e.g.*, *RSL Funding, LLC v. Pippins*, 499 S.W.3d 423, 430 (Tex. 2016) (per curiam); *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704–05 (Tex. 1998) (orig. proceeding) (per curiam).

The trial court declined to order arbitration. To ascertain whether the trial court ruled correctly, we must scrutinize the totality of what happened below—the pleadings, the motions, the discovery, the passage of time, any efforts to have a judge decide issues that should have gone to an arbitrator, and so forth. *See Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d 504, 516 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). No single factor is dispositive. *Id.*; *see RSL Funding*, 499 S.W.3d at 430. Instead, the law looks at the totality of the circumstances. *See In re Citigroup Glob. Mkts., Inc.*, 258 S.W.3d 623, 625 (Tex. 2008) (orig. proceeding) (per curiam);

*Interconex, Inc. v. Ugarov*, 224 S.W.3d 523, 533 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g) (stating that waiver depends on individual facts and circumstances of each case).

We affirm.

## Background

The Park Square Condominiums is a condominium complex located in the Galleria area of Houston. In 2014, the board of directors of Park Square Condominium Owner's Association began planning renovations to common areas of the complex, including the driveway, the parking garage, and a plaza that contained a swimming pool and tennis courts. In January 2017, Thomas Craig agreed to serve as general contractor for the renovation project, and it and Park Square signed a contract.

The parties used AIA Document A102-2007 as the form for their agreement. The agreement called for Thomas Craig to perform various contracting services, with a lump sum fee for Thomas Craig in the amount of $200,000, and a guaranteed maximum price of $2,650,000. The contract allowed the parties to choose their method for resolving any disputes:

[ X ] Arbitration pursuant to Section 15.4 of AIA Document A201-2007.

[   ] Litigation in a court of competent jurisdiction.

[   ] Other (Specify).

The parties checked the box for arbitration. Further details appear in the agreement's general conditions, a separate document incorporated into the agreement by reference. Section 15.4 calls for AAA arbitration under the Construction Industry Arbitration Rules in effect on the date of the contract:

**§ 15.4 Arbitration**

**§ 15.4.1** If the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. . . .

**§ 15.4.1.1** A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation, but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable statute of limitations. . . .

With the contract having a 2017 date, the applicable AAA rules are the 2015 Construction Industry Rules.

Thomas Craig hired about a dozen subcontractors to provide specialized services such as electrical, concrete, plumbing, waterproofing, paving, and fencing. After construction was completed, various disputes arose about the parking garage, swimming pool area, and other parts of the complex. Park Square eventually took the disputes to court.

In November 2019, Park Square filed suit against six defendants: (1) Thomas Craig; (2) Alfredo Bustamonte, individually and *d/b/a* Walker Consultants; (3) EDI

4

International; (4) Building Envelope Construction Solutions; (5) Jim Whitten Roofing Consultants; and (6) Vince Knight *d/b/a* Knight Restoration.[1] By the time the lawsuit approached its third birthday, Thomas Craig had taken numerous actions that bear on waiver of the right to go to arbitration. For example:

- It sued half a dozen subcontractors as third-party defendants;

- It asserted a counterclaim against the plaintiff;

- It engaged in significant discovery available under the Texas Rules of Civil Procedure; and

- It sought judicial rulings on merits-related issues involving the Residential Construction Liability Act.

The parties disagree about the legal consequences of Thomas Craig's activities, but nobody seriously disputes what actually took place. Thus, everyone agrees that the parties engaged in some discovery, but did they engage in enough discovery to matter? Thomas Craig downplays the discovery as preliminary and contends that the "vast majority of discovery has yet to be conducted."

But that view is not shared by the four appellees who filed appellate briefing. Park Square calls the discovery "extensive" and says, "The AAA construction rules do not provide for anywhere near the level of discovery as occurred here." Fourpoints Services also calls the discovery "extensive." Chris Tucker Contracting says, "The amount of discovery and expense would have been far less had [Thomas

---

[1] Alfredo Bustamonte, EDI International, Building Envelope Construction Solutions, and Jim Whitten Roofing Consultants are not parties to this interlocutory appeal.

Craig] moved for arbitration earlier." Vince Knight says, "[Thomas Craig] conducted a significant amount of discovery before moving to compel arbitration. . . . All such discovery pertained directly to the merits of the case—not to issues related to arbitration."

Deciding who has the better of that debate must wait because examining the discovery will take time. For the moment, it suffices to recount the high points of what occurred from the filing of suit until the denial of the motion to compel arbitration.

As noted earlier, Park Square commenced the lawsuit on November 15, 2019, by suing six defendants, one of whom was Thomas Craig. Park Square made many complaints—including leaks in the parking garage, curbs not having expansion joints, a broken ADA ramp, some exposed rebar, a problem with the swimming pool light, and a failure to clean up the site. Park Square supplied a certificate of merit from a licensed engineer, explaining the complaints in more detail.

*The Events of 2020.* In early 2020, Thomas Craig filed its answer, along with a motion to abate the suit until the two sides had gone through the process provided for by RCLA.[2] As the year went on, Park Square amended its pleadings three times,

---

[2] The Residential Construction Liability Act is designed "to promote settlement between homeowners and contractors and to afford contractors the opportunity to repair their work in the face of dissatisfaction." *Bruce v. Jim Walters Homes, Inc.*, 943 S.W.2d 121, 123 (Tex. App.—San Antonio 1997, writ denied); *see* Richard F. Whiteley, Comment, *The Scope of the Residential Construction Liability Act in*

and Thomas Craig filed cross-claims against architect Andre Landon and EDI International. After pandemic-related delays, the trial court acted to implement the RCLA process by ordering Thomas Craig to make its settlement offer by November 6, 2020, with Park Square having 25 days to respond. In December 2020, Park Square asked for the abatement to be lifted because notice had been given, inspections had been done, and Thomas Craig's settlement offer had been made and rejected, with no resolution of the dispute.

*The Events of 2021.* In May 2021, Park Square reiterated its request to lift the abatement. Thomas Craig countered by opposing the request and by moving for partial summary judgment. Specifically, Thomas Craig took the position that while it had complied with RCLA, Park Square had failed to disclose certain conditions on the property and had failed to send Thomas Craig an August 2020 memorandum and hundreds of pictures documenting conditions on the property. In Thomas Craig's view, Park Square's failure to disclose certain conditions "constitute[d] grounds for summary judgment on the undisclosed conditions." Thomas Craig thus requested a

---

*Texas*, 36 HOUS. L. REV. 277, 280–81 (1999) (discussing RCLA's legislative history). It creates a pretrial offer-of-settlement scheme, in which the claimant gives notice of a defect, the contractor gets to inspect the property, and the contractor may then make an offer to settle. *See* TEX. PROP. CODE § 27.004(a)–(b). If the claimant rejects a reasonable settlement offer, that limits the recoverable damages. *See id.* § 27.004(e). The RCLA process matters here only inasmuch as it affects the timeline. The statute creates a 60-day period for the settlement offer. *Id.* § 27.004(b). Additionally, suit is supposed to be abated if the claimant did not give pretrial notice of the defect or failed to provide the contractor with a reasonable opportunity to inspect the property. *Id.* § 27.004(d).

"court determination" on its "attempt to cure as well as its prejudice caused by" Park Square's "late submission of RCLA materials." It stated that without an "explicit ruling" from the trial court on Thomas Craig's compliance and Park Square's noncompliance with RCLA, Thomas Craig "will be absolutely prejudiced throughout the course of this entire litigation without a proper remedy."

Seeing Thomas Craig's request for a partial summary judgment, Park Square filed a summary judgment response and attached evidence. Thomas Craig re-urged its summary judgment position and asked for a court ruling on the matter. It expressly asked the court to rule that "(a) [Thomas Craig's] second supplemental offer on March 3, 2021 is deemed timely and proper for purposes of any further proceedings in this suit to which RCLA applies, or (b) [Park Square's] late-submitted complaints on December 22, 2020 did not comply with its obligations under the court-ordered RCLA procedure and are thus excluded from claims against [Thomas Craig]." Thomas Craig's request for a merits ruling did not succeed: The court lifted the abatement but did not grant Thomas Craig a partial summary judgment.

Thomas Craig then expanded the litigation by asserting claims against half a dozen subcontractors: Chris Tucker Contracting, Coulomb Electric, EMA Sport

8

Solutions, Fourpoints Services, Heathcock Enterprises, and Viking Contractors.[3] They all filed answers to Thomas Craig's allegations. The court signed a docket control order moving the trial date to March 28, 2022.

*The Events of 2022*. In January 2022, all defendants—including Thomas Craig—moved for a continuance, arguing that some third-party defendants had only recently answered and had not had an opportunity to engage in discovery. No depositions, let alone any expert depositions, had occurred. The defendants argued:

> Defendants would like to continue the case to enable them to complete discovery and evaluate the matter more completely. Further, an extension of interim deadlines will avoid the potentially unnecessary expenses associated with rushing to complete discovery, attempting a haphazard mediation, and preparing for trial in a compressed time frame.

In March 2022, the court pushed the trial date back to August 1, 2022.

In May 2022, Thomas Craig moved for a continuance and an amended docket control order. In addition to noting that the parties had a mediation scheduled for a week later, Thomas Craig also stated that the parties had designated 19 fact witnesses and 7 expert witnesses, with more expert designations possibly forthcoming. In Thomas Craig's estimation, "approximately 35 witnesses are to be deposed before this case can be reasonably ready for trial." It attached a proposed amended docket control order setting various new deadlines. The court granted Thomas Craig's

---

[3] Coulomb Electric, EMA Sport Solutions, and Heathcock Enterprises are not parties to this interlocutory appeal.

motion for continuance and moved the trial date back even further, this time to June 12, 2023, as requested in the proposed docket control order.

But a new clash broke out at the behest of one of the subcontractors whom Thomas Craig had sued. Chris Tucker Contracting launched an attack on Thomas Craig's very right to litigate. In July 2022, Tucker pointed that Thomas Craig had failed to pay its franchise taxes. Tucker argued that Thomas Craig was therefore a "terminated" entity under Business Organizations Code Chapter 11:

> [Thomas Craig] has been a terminated entity since August 5, 2016. Claims by a terminated entity are extinguished unless an action or proceeding is brought on the claim not later than three years after the date the entity's existence terminated.
>
> Since [Thomas Craig] filed its claims against Tucker Contracting approximately five years after [Thomas Craig] forfeited its existence, all claims against Tucker Contracting are extinguished.

Tucker sought summary judgment on the issue of Thomas Craig's termination, and it set its summary judgment motion for a hearing on December 7, 2022.[4]

In October 2022, Thomas Craig moved to compel arbitration, arguing that the arbitration clause in its general contract with Park Square encompassed all claims asserted by or against it in the litigation, including the third-party claims against its subcontractors.

---

[4] Other third-party-defendant subcontractors filed motions for summary judgment on the same basis, including Knight and Fourpoints Services.

Several of the other parties resisted the motion. They contended that Thomas Craig had done too much and waited too long to change course now, and it had waived its right to arbitrate by substantially invoking the judicial process. As an example of Thomas Craig's conduct that was inconsistent with the right to arbitrate, they pointed to all the discovery that had occurred. This discovery included hundreds of requests for production propounded by Thomas Craig against Park Square and the subcontractors.

In reply, Thomas Craig acknowledged that some discovery had already taken place, but it saw arbitration as a venue for obtaining even more discovery and for resolving certain discovery disputes. Specifically, Thomas Craig expressed dissatisfaction with the discovery process so far, explaining that "arbitration is sought because of problems already encountered in discovery."

As an example, Thomas Craig stated that Park Square had "designated 10 witnesses that it has failed to produce for deposition within the availability of the parties. [Thomas Craig] has made repeated requests for these depositions, as well as corporate representatives. Park Square initially offered a few dates, but then stopped all efforts to schedule these depositions."

In addition, Thomas Craig expressed concerns that Park Square had destroyed or failed to produce critical evidence. For example, although it had the official minutes of various Park Square board meetings, it also wanted to have any existing

11

audio recordings too, and it felt that Park Square should have turned over the recordings. Further, Thomas Craig contended that Park Square had failed to produce guard shack records, which Thomas Craig felt would show its presence on the site and would counter Park Square's argument that Thomas Craig "was often not present during the project." Thomas Craig proposed arbitration as the right solution for these discovery disputes, stating, "Arbitration provides the parties with the flexibility to address these challenges."

The trial court held a hearing on both the summary judgment motion about Thomas Craig being a terminated entity and the motion to compel arbitration. The court sided with Thomas Craig on the issue of termination, but it disagreed with Thomas Craig on the issue of arbitration. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE § 51.016.

### Waiver of Arbitration by Substantial Invocation of Judicial Process

In its sole issue on appeal, Thomas Craig argues that the trial court erred by denying its motion to compel arbitration because Park Square and the subcontractors opposing arbitration had not met their burden to show (1) Thomas Craig had waived its right to arbitrate by substantially invoking the judicial process, and (2) Thomas Craig's litigation conduct had prejudiced the opposing parties.

## A.    Standard of Review and Governing Law

We review an order denying a motion to compel arbitration for abuse of discretion. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules and principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We defer to the trial court's factual determinations that are supported by the evidence, but we review its legal determinations de novo. *Henry*, 551 S.W.3d at 115.

A party who opposes the enforcement of a valid arbitration agreement based on the defense of waiver bears the burden of proving the defense. *Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499–500 (Tex. 2015); *Pounds v. Rohe*, 592 S.W.3d 549, 554 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Because the law favors arbitration, this burden is a heavy one. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 512 (Tex. 2015); *Pounds*, 592 S.W.3d at 554.

A party may waive its right to arbitration either expressly or impliedly. *G.T. Leach Builders*, 458 S.W.3d at 511. Waiver of arbitration may be implied from a party's conduct, so long as the conduct is unequivocal. *Courtright*, 647 S.W.3d at 516. Where implied waiver is at issue, the traditional rule has been that the party seeking to establish waiver must show that (1) the party moving to compel

13

arbitration substantially invoked the judicial process in a manner inconsistent with the right to compel arbitration and (2) this inconsistent conduct caused the nonmoving party to suffer detriment or prejudice. *G.T. Leach Builders*, 458 S.W.3d at 511–12 (citing *Perry Homes v. Cull*, 258 S.W.3d 580, 593–94 (Tex. 2008)).

Whether a party waives its right to arbitration by substantially invoking the judicial process depends on the totality of the circumstances. *See id.* at 512; *Perry Homes*, 258 S.W.3d at 590. We decide the issue on a case-by-case basis taking into consideration a multitude of non-exclusive factors, including:

- how long the movant waited before moving to compel arbitration;

- the reasons for the movant's delay;

- whether and when, during the period of delay, the movant knew of the arbitration agreement;

- how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits;

- whether the discovery would be unavailable or useful in arbitration;

- whether the movant asked the court to dispose of claims on the merits;

- whether the movant asserted affirmative claims for relief in court;

- the extent of the movant's engagement in pretrial matters related to the merits (rather than to arbitrability or jurisdiction);

- the time and expense the parties committed to the litigation;

- whether activity in court would be duplicated in arbitration; and

- when the case is set to be tried.

*G.T. Leach*, 458 S.W.3d at 512; *Perry Homes*, 258 S.W.3d at 590–92. In general, no single factor is dispositive. *RSL Funding*, 499 S.W.3d at 430. Nor must all or most of these factors be present to support waiver. *See Perry Homes*, 258 S.W.3d at 591. Courts look to the specifics of each case. *Henry*, 551 S.W.3d at 116.

This Court has discussed and applied the totality of the circumstances approach in many of our recent arbitration decisions. *See, e.g.*, *GRGP, Inc. v. Black Forest Holdings, Inc.*, No. 01-23-00314-CV, 2023 WL 8459522, at *3–6 (Tex. App.—Houston [1st Dist.] Dec. 7, 2023, no pet.) (mem. op.) (finding waiver); *Buzbee v. Terry & Thweatt, P.C.*, No. 01-23-00123-CV, 2023 WL 7311212, at *4–5 (Tex. App.—Houston [1st Dist.] Nov. 7, 2023, pet. denied) (mem. op.) (waiver); *Courtright*, 647 S.W.3d at 516–22 (waiver); *Turnbull Legal Grp., PLLC v. Microsoft Corp.*, No. 01-20-00851-CV, 2022 WL 14980287, at *9–15 (Tex. App.—Houston [1st Dist.] Oct. 27, 2022, pet. denied) (mem. op.) (no waiver); *Archimedes, Inc. v. Russell*, No. 01-21-00222-CV, 2022 WL 2024851, at *2–4 (Tex. App.—Houston [1st Dist.] June 7, 2022, no pet.) (mem. op.) (waiver); *Jetall Companies, Inc. v. Sonder USA Inc.*, No. 01-21-00378-CV, 2022 WL 17684340, at *12–14 (Tex. App.—Houston [1st Dist.] Dec. 15, 2022, no pet.) (mem. op. on reh'g) (no waiver).

All parties in this case agree on the relevant legal rules. The only dispute involves applying those rules to the facts of this record.

**B.** **Whether Thomas Craig Substantially Invoked the Judicial Process Through Its Litigation Conduct**

**1.** **Delay, the reasons for delay, and whether the movant knew of the arbitration clause**

Start with the timeline. No one disagrees about the amount of delay in requesting arbitration in that the dates speak for themselves. Park Square filed suit on November 15, 2019, and Thomas Craig moved to compel arbitration on October 10, 2022. That comes to 35 months of delay—which is more than 1000 days.

Why this much delay? For that matter, why any delay at all? Thomas Craig could have moved to compel arbitration on day one, day 100, or day 500. Thomas Craig does not contend that it was unaware of the arbitration clause. Such a contention would be hard to maintain because the law charges signatories to a contract with knowledge of its contents. *See Prof'l Advantage Software Sols., Inc. v. W. Gulf Mar. Ass'n*, No. 01-15-01006-CV, 2016 WL 2586690, at *4 (Tex. App.— Houston [1st Dist.] May 5, 2016, no pet.) (mem. op.). Regardless, Thomas Craig has not adequately explained any of its delay.

Instead, Thomas Craig cites the COVID-19 pandemic and observes that there was an abatement and stay pursuant to RCLA, at least until the stay was lifted on August 12, 2021. Thomas Craig has a point when it comes to the pandemic. The world operated differently during that time; many activities that might once have been quick and easy became more difficult during the pandemic, especially in its

early stages. Even so, none of the fallout from the pandemic explains this much delay in seeking arbitration. Whatever the pandemic's impact, and whatever the effect of the RCLA abatement, Thomas Craig still could have asked for arbitration.

Further, Thomas Craig says that much of the delay should be disregarded because one subcontractor—Vince Knight *d/b/a* Knight Restoration—went unserved by Park Square until June 2022. Thomas Craig did not assert a third-party claim against Knight until July 2022. Thomas Craig sees Knight as essential to the whole lawsuit: "Thus, no trial setting before Knight Restoration's joinder could have included this key party whom Park Square and its expert have considered essential to this case from the beginning." The argument seems to be that resolving this case without Knight would be like staging a production of *Hamlet* without an actor to play the Prince of Denmark.

The premise of that argument appears open to serious question. On this record, Knight looks less like Hamlet and more like Rosencrantz or Guildenstern. To be fair, this controversy has a long way to go, so the existing record cannot tell the whole story. But even if Thomas Craig is right in portraying Knight as indispensable, none of this explains why Thomas Craig chose to continue litigating in court so long without asking for arbitration.

Thomas Craig also argues that its contract with Park Square made mediation a condition precedent to requesting arbitration, pointing to the statement that "[a]

17

demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation." Due to the number of parties and attorneys involved, logistical difficulties meant that mediation was not scheduled until May 2022. This mediation was not successful—at least in part due to Knight's absence, according to Thomas Craig. It argues that, under the contract, it could not have sought arbitration before the May 2022 mediation, and it moved to compel arbitration in October 2022: only 5 months after the unsuccessful mediation. Thomas Craig argues that this delay was not unreasonable.

We find this argument unavailing. The contractual language allows a party to demand arbitration and request mediation concurrently. Even considering the logistical challenges in arranging a multi-party mediation, nothing prevented Thomas Craig from making a simultaneous demand for mediation and arbitration at the outset of its involvement in the case. *See Courtright*, 647 S.W.3d at 518. Instead, it waited nearly three years to move for arbitration.

Thomas Craig has not offered, and the Court cannot perceive, any reason for this much delay. These factors weigh in favor of finding waiver.

### 2. Discovery and availability of discovery in arbitration

Next, courts look at how much discovery the movant conducted before moving to compel arbitration and whether that discovery related to the merits. *Courtright*, 647 S.W.3d at 516. Where discovery is minimal, waiver becomes less

18

likely. *Id.* at 520; *see Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 575, 576 (Tex. 2014) (per curiam) (stating that party who sent one request for disclosure engaged in "only minimal discovery"). Conversely, full discovery makes waiver more likely.

The AAA rules do not envision much discovery. Arbitration derives much of its value from limiting discovery and thus reducing time and money spent litigating. *See, e.g.*, *In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 695 (Tex. 2008) (orig. proceeding) (per curiam) (stating that limited discovery is one of arbitration's "most distinctive features") (quotations omitted); *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995) ("[T]he discovery provisions of the Federal Rules of Civil Procedure are more generous than those of the American Arbitration Association."). In particular, discovery under the AAA Construction Industry rules is "extremely limited." *Cleveland v. Power Home Solar, LLC*, 245 N.E.3d 413, 426 (Ohio Ct. App. 2024).

The discovery here went well beyond the "extremely limited." Thomas Craig sent 208 requests for production to Park Square. Then it sent Park Square a second set of requests for production with 16 more. Thomas Craig sent 66 requests for production to Coulomb Electric. Thomas Craig sent the same 66 requests to EMA Sport Solutions, and to Heathcock Enterprises, and to Viking Contractors. These requests for production all related to the merits of the underlying claims, not issues

19

of arbitrability. *See G.T. Leach Builders*, 458 S.W.3d at 512 (considering "how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits").

This quantity far exceeds the 135 requests for production in *Courtright*, a case where we upheld the trial court's denial of a motion to compel arbitration based on waiver. *See* 647 S.W.3d at 518 (upholding waiver finding in part based on party sending 135 requests for production, 47 interrogatories, 7 deposition notices with subpoena duces tecum, and 2 subpoenas to non-parties before later moving to compel arbitration); *see also GRGP*, 2023 WL 8459522, at *5 (upholding waiver finding when party sent 42 requests for production, 39 requests for admission, 14 interrogatories, and 2 deposition notices with subpoena duces tecum to third parties).

What also matters is the breadth of discovery sought. The AAA Construction Industry rules provide for very limited discovery, even in the largest cases. This lawsuit would fall within the AAA Construction Industry rules for large and complex cases. Rule L-4 calls for the process to be "expedited" and "cost-effective."[5] Parties in a large and complex case have no right to take even one deposition unless the arbitrator finds the case to be "exceptional":

---

[5]     *See* AM. ARB. ASS'N, Construction Industry Arbitration Rules and Mediation Procedures L-4(a), (d), (e) (effective July 1, 2015), *available at* https://www.adr.org/media/va5jdqiq/constructionrules_web_0.pdf (last visited June 21, 2025).

(f)     In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.[6]

To see the breadth of discovery here, one may sample the 208 requests for production that Thomas Craig sent to Park Square. Start with the first ten requests.

Please produce each of the following:

1. Plaintiff's entire project file for the project in question.

2. Plaintiff's entire project file pertaining to Hurricane Harvey repairs, relief efforts, or related claim(s) or benefit(s) involving FEMA for the property in question.

3. All material contracts concerning the project in question.

4. All supply contracts concerning the project in question.

5. All change orders and change order logs for the project in question.

6. All drawings and specifications of the project in question.

7. All bids and bid sets concerning the project in question.

8. All shop drawings concerning the project in question.

9. All specifications concerning the project in question.

10. All take-offs, drafts, and sketches concerning the project in question.

Requests 11–20 ask for the following:

11. All submittals and submittal logs for the project in question.

12. All bids and bid documents for the project in question.

---

[6]     *See id.* Rule L-4(f).

13. All project manager or supervisor daily reports or logs for the project in question.

14. All project scheduling charts for the project in question.

15. All calendar entries regarding the project in question.

16. All progress reports for the project in question.

17. All inspection reports for the project in question.

18. All draw requests for the project in question.

19. All purchase orders for the project in question.

20. All supplier invoices for the project in question.

Request 46 asks for the following "electronic or magnetic data in Native or Near-Native format":

a. All photographs pertaining to the project in question.

b. All videos pertaining to the project in question.

c. All drawings and specifications pertaining to the project in question.

d. All shop drawings pertaining to the project in question.

e. All "As Built" Drawings pertaining to the project in question.

f. All shop drawings for all HVAC or other equipment installed or that should have been installed in the project in question.

g. All Electronic Plans and Specs pertaining to the project in question.

h. All deleted e-mails with attachments pertaining to the project in question.

i. All emails with attachments pertaining to the project in question.

Requests 47 and 48 ask for copies of any relevant building codes or industry standards:

47. If Plaintiff contends any of Thomas Craig Construction, Inc.'s work on the project in question was not performed in accordance with the plans and specifications, industry standards, any applicable building or other code, or other industry standard, then please produce a copy of each and every such code or standard that supports each and every such contention by Plaintiff.

48. If Plaintiff contends anyone provided work, goods, or services to the project in question that was not provided in accordance with the plans and specifications, industry standards, any applicable building or other code, or other industry standard, then please produce a copy of each and every such code or standard that supports each and every such contention by Plaintiff.

Requests 102–04 inquire about matters relating to Hurricane Harvey, which hit Houston in August 2017:

102. All documentation or data on billing, payments, credits, offsets, retainage, costs, expenses, budgets, any bonus, or other financial information for the time period January 1, 2014 to the present pertaining to Hurricane Harvey repairs, relief efforts, or related claim(s) or benefit(s) involving FEMA for the property in question. NOTE: Please produce these items in a readily reviewable electronic format including and showing all of the related data available to you.

103. All documentation or data on billing, payments, credits, offsets, retainage, costs, expenses, budgets, any bonus, or other financial information for the time period January 1, 2014 to the present pertaining to bidding, investigation, or evaluation related to the project in question. NOTE: Please produce these items in a readily reviewable electronic format including and showing all of the related data available to you.

104. All documentation or data on billing, payments, credits, offsets, retainage, costs, expenses, budgets, any bonus, or other financial information for the time period January 1, 2014 to the present pertaining to bidding, investigation, or evaluation related to Hurricane Harvey repairs, relief efforts, or related claim(s) or benefit(s) involving FEMA for the property in question. NOTE:

Please produce these items in a readily reviewable electronic format including and showing all of the related data available to you.

Requests 190–98 ask broadly for any "comments" or "communications" from any resident in the complex pertaining to the property, the parties, or the project, plus similar records and communications:

190. All comments, communications, or requests from any resident, member, or unit-owner to Plaintiff and pertaining to the portions of the property involved in the project in question from January 1, 2014 to present.

191. All comments, communications, or requests from any resident, member, or unit-owner to Plaintiff and pertaining to any named party to this lawsuit from January 1, 2014 to present.

192. All comments, communications, or requests from any resident, member, or unit-owner to Plaintiff and pertaining to the project in question from January 1, 2014 to present.

193. All certificates of insurance for the parties to this lawsuit obtained by Plaintiff in connection with the project in question or otherwise.

194. All certificates of insurance for anyone who participated in the project in question and obtained by Plaintiff.

195. Any records of inspections, reports, reviews, or evaluations conduct[ed] by or for any lending or financing entity in connection with the project in question.

196. Any loan or financing records for the project in question with Plaintiff as a party to the loan or other financing agreement.

197. Any loan or financing records for the project in question with the property in question as collateral or as security interest in whole or in part.

198. Any communications between Plaintiff and any lender pertaining to the project in question.

Finally, requests 203–08 ask about primary insurance, excess insurance, umbrella insurance, or any other liability insurance:

203. Any primary, excess, umbrella, or other liability insurance in effect during the project in question with any director for Plaintiff as an insured.

204. Any communications between Plaintiff and any primary, excess, umbrella, or other liability insurer for any director for Plaintiff as an insured pertaining to the project in question.

205. Any primary, excess, umbrella, or other liability insurance in effect during the project in question with any officer for Plaintiff as an insured.

206. Any communications between Plaintiff and any primary, excess, umbrella, or other liability insurer for any officer for Plaintiff as an insured pertaining to the project in question.

207. Any primary, excess, umbrella, or other liability insurance in effect during the project in question with any member of Plaintiff as an insured.

208. Any communications between Plaintiff and any primary, excess, umbrella, or other liability insurer for any member [of] Plaintiff as an insured pertaining to the project in question.

None of this looks like what the AAA contemplates for a case under the Construction Industry rules. In the AAA's view, "construction arbitration should provide a less expensive, more expeditious and final form of dispute resolution than that offered in state or federal litigation."[7] The AAA rules strongly disfavor broad

---

[7]    *See* AM. ARB. ASS'N, American Arbitration Association Discovery Best Practices for Construction Arbitration, *available at* https://go.adr.org/rs/294-SFS-516/images/AAA341_AAA_Discovery_Best_Practices_Construction_Arbitration.pdf (last visited June 21, 2025).

discovery.[8] The degree of discovery here goes well beyond what the AAA rules contemplate. *See G.T. Leach Builders*, 458 S.W.3d at 512 (considering "whether the discovery conducted would be unavailable or useful in arbitration").

Thomas Craig has steadfastly maintained that much more discovery remains to occur. In the trial court, Thomas Craig took the position that "approximately 35 witnesses are to be deposed before this case can be reasonably ready for trial." On appeal, Thomas Craig takes the same position. Its opening brief says that "at least 33 witness depositions have been preliminarily identified," and only 4 depositions have occurred. Its reply brief says that "11 or more additional fact witness depositions are needed from Park Square alone," that an "additional 20 depositions of other parties are still needed," and that "[s]ome or all" of "41 additional witnesses identified by Park Square . . . also need to be deposed."

Thomas Craig appears to see the discovery efforts so far as the tip of a great iceberg. But arbitration gets its value from avoiding discovery icebergs altogether, not sailing straight into fields of them. The AAA rules do not envision giving parties

---

[8] *See* W. Alexander Moseley, *What Do You Mean I Can't Get That? Discovery in Arbitration Proceedings*, 26 CONSTR. LAW. 18, 21 (Fall 2006); George E. Lieberman, *Discovery in an Arbitration Proceeding and Appealing an Award Under the Federal Arbitration Act: It's Not That Simple (and What You Do Not Know Can Hurt You)*, 56 FED. LAW. 54, 54 (May 2009) ("The subject of discovery in an arbitration proceeding usually generates modest interest, at best, because the parties hold the mistaken belief that a party to an arbitration is entitled to the same or virtually the same type and extent of discovery authorized by the federal discovery rules (or similar state rules). Nothing would be further from the truth.").

the right to run up costs with dozens of depositions and the kinds of broad-ranging document requests that Thomas Craig has in mind. They envision the opposite.

Thomas Craig's argument seems to assume the premise that the case will generate 35 or 40 more depositions no matter what the forum; ergo, the four depositions so far amount to a mere trifle. But that premise will not hold. Nothing supports the notion that AAA arbitration would result in dozens of depositions. Rule L-4 and the other pronouncements from the AAA indicate the contrary.

### 3. Affirmative relief and pretrial matters related to the merits

Thomas Craig asserted cross-claims in August 2020 against existing parties Andre Landon and EDI International for negligence, negligent misrepresentation, breach of warranty, contribution, and indemnity. Later in the suit, in December 2022, Thomas Craig non-suited those claims.

Thomas Craig filed an original third-party petition against subcontractors Chris Tucker Contracting, Coulomb Electric, EMA Sport Solutions, Fourpoints Services, Heathcock Enterprises, and Viking Contractors, seeking contribution and indemnity. In an amended third-party petition, Thomas Craig later added Knight as a third-party defendant.

Thomas Craig also asserted counterclaims against Park Square, alleging claims for breach of contract, quantum meruit, fraud, fraudulent inducement, and

negligent misrepresentation. It later amended its counterclaims by adding allegations under the prompt payment provisions of Texas Property Code section 28.002.

In addition to asserting claims for affirmative relief, Thomas Craig also engaged in pretrial activities relating to the merits of the lawsuit. For nearly the first two years of this suit, Thomas Craig and Park Square were involved in a dispute about RCLA procedures. Ultimately, after the trial court abated the case and set deadlines for Thomas Craig to make a settlement offer and Park Square to respond, Thomas Craig made a settlement offer under RCLA to Park Square in November 2020. Park Square rejected the offer, but the manner in which it did so caused a further dispute between the parties: Thomas Craig believed that Park Square's rejection letter raised issues with the property that had not been raised in Park Square's initial RCLA notice.

After Thomas Craig raised this concern, Park Square "sent numerous materials to [Thomas Craig] for the first time pertaining to [Park Square's] site conditions, including a 48-page memorandum dated August 1, 2020, 98 non-dated photos, 116 photos dated January 6, 2020, and 246 photos and drawings dated January 13, 2020." Thomas Craig then sent a second settlement offer under RCLA.

Park Square twice moved to lift the abatement, arguing that the parties had fulfilled their RCLA obligations and the case should proceed. Following Park Square's second motion to lift the abatement, Thomas Craig responded and objected.

In its response, Thomas Craig appeared to seek a summary judgment ruling from the

trial court:

> Although [Park Square] provided [Thomas Craig] some carefully edited notice of its claims, [Park Square] waited until after [Thomas Craig] made its initial RCLA settlement offer to mention its grounds for rejecting that offer, which encompassed intentionally withheld materials and information. Materials and information [Thomas Craig] had no opportunity [to] investigate or even consider. Moreover, the agreed inspections [of the property] had already passed, so [Thomas Craig] was completely deprived of any opportunity to inspect the site conditions allegedly depicted in [Park Square's] late-submitted materials. As *Vision 20/20* [a Fourteenth Court of Appeals case cited by Thomas Craig] dictates, [Park Square's] failures in this regard *constitute grounds for summary judgment on the undisclosed conditions*. Alternatively, and in an abundance of caution, [Thomas Craig] respectfully seeks relief from such prejudice, namely [Thomas Craig's] second supplemental RCLA settlement offer, be held to have either: (1) complied with RCLA; or (2) that [Park Square's] failure deemed non-compliant in accordance with RCLA, so the stay can be lifted and the litigation commence.

(Emphasis added.)

Thomas Craig therefore sought partial dismissal of Park Square's claims

against it based on Park Square's alleged failure to comply with RCLA. The trial

court lifted the RCLA-related stay of proceedings, but it did not make any ruling

about compliance with RCLA or dismiss any portion of Park Square's claims against

Thomas Craig. *See PRSI Trading Co. LP v. Astra Oil Trading NV*, No. 01-10-00517-

CV, 2011 WL 3820817, at *4 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, pet.

denied) (mem. op. on reh'g) ("Rather than seeking to avoid litigation, PRSI Trading

chose to litigate the merits of its defenses to the $10 million loan claim in the trial

court. This type of litigation behavior—unsuccessfully attempting to obtain a favorable result in court before requesting a referral to arbitration—is yet another factor supporting the trial court's waiver finding.").

This record reflects that Thomas Craig asserted affirmative claims for relief in the trial court and also participated in pretrial matters related to the merits of claims asserted in the litigation. *See Courtright*, 647 S.W.3d at 520–21 (considering plaintiffs' assertion of affirmative claims as well as their filing of "extensive pretrial pleadings and motions," participation in evidentiary hearings, and conducting of "substantial discovery"); *see also Perry Homes*, 258 S.W.3d at 592 ("Waiver involves substantial invocation of the judicial *process*, not just judgment on the merits.").

### 4. Time and money spent in litigation

This litigation lasted for 35 months before Thomas Craig requested arbitration. As for money spent on the litigation, Park Square represented to the trial court in writing that it had incurred $112,258.11 in litigation expenses as part of the litigation. *See GRGP*, 2023 WL 8459522, at *6 (finding waiver in part based on affidavit representing that plaintiff had incurred $279,613 in fees); *Adams v. StaxxRing, Inc.*, 344 S.W.3d 641, 651 (Tex. App.—Dallas 2011, pet. denied) (finding waiver when plaintiffs had incurred $110,000 in fees).

## 5. Trial settings and duplication of litigation activity

The lawsuit has had numerous trial settings. An initial setting scheduled the case for trial on June 14, 2021. The court then reset it for November 1, 2021, and then reset it again for March 28, 2022. All defendants—including Thomas Craig—moved for continuance and requested that the trial court reset the case because Thomas Craig had recently asserted third-party claims against the subcontractors who had not had an opportunity to participate in discovery, which was incomplete. Then the court reset the case for August 1, 2022. Thomas Craig then moved for another continuance. It informed the court that the parties had scheduled a mediation, stated that "approximately 35 witnesses are to be deposed before this case can be reasonably ready for trial," and requested that the trial court issue an amended docket control order that reset trial for June 12, 2023. The trial court granted Thomas Craig's motion and reset the case for that date.

Although the "hurdle" to establish waiver of arbitration is a "high one," after considering the totality of the circumstances, we conclude that Thomas Craig has cleared that hurdle and substantially invoked the judicial process. *See G.T. Leach Builders*, 458 S.W.3d at 512 (quotations omitted). We thus turn to whether the record demonstrates that Thomas Craig's conduct inconsistent with exercising the right to arbitrate has caused detriment or prejudice to the parties opposing Thomas Craig's motion to compel arbitration.

## C.    Prejudice

The prejudice issue presents a slight wrinkle because of recent developments in the Federal Arbitration Act caselaw. As Thomas Craig has noted, this case involves the FAA. Some years ago, a national split arose about whether the FAA requires prejudice as part of the waiver analysis. *See, e.g.*, *Cabinetree of Wis.*, 50 F.3d at 390 (7th Cir. 1995) (holding that showing of prejudice is not required and stating, "Ours may be the minority position but it is supported by the principal treatise on arbitration"); *see also* John Bruce Lewis & Dustin M. Dow, *Searching for Clarity Amid Confusion: An Examination of the Standards for Determining Waiver and Revival of the Right to Arbitrate*, 67 U. KAN. L. REV. 327, 342 (2018) ("[T]he waiver doctrine in arbitration is neither uniform in application nor connected in linear fashion."). This split of authority resulted in a grant of certiorari, whereupon the U.S. Supreme Court rejected the prejudice requirement for cases in federal court. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 416–17 (2022).

The *Morgan* ruling may have implications for Texas law because the Texas Supreme Court has worked hard to keep state and federal arbitration law consistent. *See, e.g.*, *Perry Homes*, 258 S.W.3d at 594 ("We have noted before the importance of keeping federal and state arbitration law consistent."); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding) ("[I]t is important

for federal and state law to be as consistent as possible in this area, because federal and state courts have concurrent jurisdiction to enforce the FAA.").

Hence, Texas might no longer require a showing of prejudice in FAA cases. *See Dallas Excavation Sys., Inc. v. Orellana*, 697 S.W.3d 702, 709 (Tex. App.—Dallas 2024, no pet.) ("While the Texas Supreme Court has not yet addressed the second *Perry Homes* factor since *Morgan* was issued, based on *Morgan*, we conclude a showing of prejudice is no longer required in order to establish waiver, at least in cases involving the FAA."). That would be consistent with the Seventh Circuit's observation that "in ordinary contract law, a waiver normally is effective without proof of consideration or detrimental reliance." *Cabinetree of Wis.*, 50 F.3d at 390; *see also Morgan*, 596 U.S. at 417 ("To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party. That analysis applies to the waiver of a contractual right, as of any other.").

Declining to require prejudice would also be consistent with the purposes of the FAA. *See* Thomas J. Lilly Jr., *Participation in Litigation as a Waiver of the Contractual Right to Arbitrate: Toward a Unified Theory*, 92 NEB. L. REV. 86, 122 (2013) ("Courts that allow the parties to litigate until some point in the process at which prejudice is deemed to have occurred encourage the parties to an arbitration agreement to try litigating a dispute before deciding whether to arbitrate. A rule that

requires the parties to choose their forum at the pleading stage encourages the efficient resolution of disputes and thus effectuates the purpose of the FAA.").

However, that question must await another day because prejudice plainly exists on this record. Here the discovery went so deep, and the lawsuit took so long, that no one in this case can ever go back to the world of quick, efficient, and low-cost dispute resolution. Additionally, the effort to win a partial summary judgment related to RCLA compliance shows prejudice. *See GRGP*, 2023 WL 8459522, at \*7 ("[P]rejudice is shown when a party attempts to have it both ways by switching between litigation and arbitration after the results of litigation prove unsatisfactory.") (citing *Pounds*, 592 S.W.3d at 558).

Moving the case to arbitration at this point would give everyone the worst of both worlds. The litigants have already lost all hope of arbitration's cardinal virtues—speed, efficiency, and cost control. Exiting the courthouse now would lock in those losses, while strangling the upsides that the judicial system offers. Those upsides include trial rights such as application of the rules of civil procedure and the rules of evidence. They include comparable rights that come on appeal (*e.g.*, appeal as of right to the court of appeals, the right to an opinion that explains the decision, and the right to seek discretionary review). The result would be the dispute resolution equivalent of buying high and selling low. That constitutes prejudice.

## Conclusion

We affirm the order denying Thomas Craig's motion to compel arbitration.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.